UNITED STATES COURT OF APPEALS
FIFTH CIRCUIT

_____

No. 94-60184
_____

IRINEO MONTOYA,

Petitioner-Appellee,
Cross-Appellant,

versus

WAYNE SCOTT, DIRECTOR, TEXAS DEPARTMENT OF
CRIMINAL JUSTICE, INSTITUTIONAL DIVISION,

Respondent-Appellant,
Cross-Appellee.

_____

Appeals from the United States District Court
for the Southern District of Texas
_____
(September 12, 1995)

Before GARWOOD, JONES, and EMILIO M. GARZA, Circuit Judges.

PER CURIAM:

Wayne Scott, Director of the Texas Department of Criminal Justice, appeals, and Irineo Montoya cross-appeals, from the district court's conditional grant of Montoya's petition for a writ of habeas corpus under 28 U.S.C. § 2254 (1988). We affirm in part, reverse in part, and remand with instructions to deny relief.

I

Montoya and a friend, Juan Villavicencio, killed John Kilheffer after Kilheffer picked them up hitchhiking home from the Port of Brownsville, Texas. In his confession, Montoya claimed

that he held Kilheffer in the back seat while Villavicencio, who had pushed Kilheffer out of the driver's seat and was driving Kilheffer's vehicle, stabbed Kilheffer. However, a witness at trial testified that Villavicencio had told him, in Montoya's presence, that Montoya had held Kilheffer in the back seat and stabbed him, and further that while Villavicencio told the story, Montoya made faces as if he were laughing. Montoya and Villavicencio stole Kilheffer's jewelry, clothes, and wallet and left his body in a grapefruit grove.

A jury convicted Montoya of capital murder. At the sentencing phase of Montoya's trial, the State introduced evidence that during the months in and around the time of the murder, Montoya had raped one woman and sexually assaulted and robbed another at knife point. Montoya called witnesses who testified that he was a responsible and respectful young man and that they had never seen him with a weapon or acting disrespectfully toward women. The jury answered "yes" to the first two Texas special issues,[1] and the trial court sentenced Montoya to death. *See* Tex. Code Crim. Proc. Ann. art. 37.071(e) (West 1981).

The Texas Court of Criminal Appeals affirmed Montoya's

---

[1] The Texas Code of Criminal Procedure in effect at the time of Montoya's trial provided:
> On conclusion of the presentation of the evidence, the court shall submit the following issues to the jury:
> (1) whether the conduct of the defendant that caused the death of the deceased was committed deliberately and with the reasonable expectation that the death of the deceased or another would result;
> (2) whether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society . . . .
Tex. Code Crim. Proc. Ann. art. 37.071(b) (West 1981). The third special issue, which pertains to provocation by the victim, did not apply and was not submitted.

conviction and sentence, and the United States Supreme Court denied certiorari. Montoya then filed a petition for a state writ of habeas corpus. The state trial court entered findings of fact and conclusions of law the day after Montoya filed his petition. Later that day, the Texas Court of Criminal Appeals denied the writ based on the trial court's findings of fact and conclusions of law. The next day, Montoya filed a petition for a federal writ of habeas corpus, and the district court stayed Montoya's execution pending its consideration of Montoya's claims.[2]

The district court granted Montoya's petition on two of his claims and denied relief on the other twenty-five. The court also issued a certificate of probable cause to appeal. Scott appeals from the district court's judgment with respect to the two claims on which the district court granted Montoya habeas relief, and Montoya cross-appeals with respect to six of the claims on which the district court granted relief.

## II

"We freely review the district court's legal conclusions, but `[t]he factual findings of a federal district court in a habeas action should not be set aside unless they are clearly erroneous.'" *Self v. Collins*, 973 F.2d 1198, 1203 (5th Cir. 1992) (footnote and citations omitted) (quoting *Guzman v. Lensing*, 934 F.2d 80, 82 (5th Cir. 1991)), *cert. denied*, ___ U.S. ___, 113 S. Ct. 1613, 123 L. Ed. 2d 173 (1993).

---

The State waived the exhaustion requirement of 28 U.S.C. § 2254(b) (1988).

Scott argues first that the district court erroneously held that the state trial court judge coerced the jury into answering the Texas special issues affirmatively. We review de novo a district court's determination that a habeas petitioner's trial court coerced the jury into rendering a verdict. *Boyd v. Scott*, 45 F.3d 876, 882 (5th Cir. 1994), *cert. denied*, ___ U.S. ___, 115 S. Ct. 1964, 131 L. Ed. 2d 855 (1995).

After deliberating on the special issues for an hour and forty minutes, the jury foreman sent the court two notes. The first read: "We have not been able to reach a unanimous decision on yes or no." The second, which the court received minutes later, read: "We are awaiting further instructions. We are all definite in our decisions." The court proposed asking the jury, "Ladies and Gentlemen of the Jury: Without telling me for what answer the jury has cast its votes, could you please indicate what the numerical vote is for each special issue?" While the court discussed this proposal with counsel, the jury sent a third note indicating that they were no longer deliberating and were awaiting further instructions. Defense counsel moved for a directed verdict, and the court, which noted that the jury had been deliberating for only an hour and forty minutes, overruled the motion and sent its note inquiring as to the jury's vote.

The jury responded that it was divided nine to three on the first special issue and ten to two on the second special issue. Defense counsel renewed his motion for a directed verdict, but the

court sent the following note to the jury: "Would you please deliberate for another 30 minutes to see if you are able to reach an answer to the special issues in accordance with the Court's instructions and please report to me after that." Forty minutes later, the jury informed the court that it had reached a verdict.

The district court held that the state trial court's request that the jury continue deliberating for thirty minutes, following its inquiry into the jury's numerical division, unconstitutionally coerced the jury. In so holding, the district court relied primarily on our decision in *United States v. Lindell*, 881 F.2d 1313 (5th Cir. 1989), *cert. denied*, 496 U.S. 926, 110 S. Ct. 2621, 110 L. Ed. 2d 642 (1990). The district court's reliance on *Lindell* was misplaced, however, because our decision in *Lindell* was an exercise of our federal supervisory powers over the use of "*Allen* charges"[3] in federal criminal trials. *See id.* at 1320-21. On direct review of a federal criminal conviction, we "scrutinize the Allen charge for compliance with two requirements: `(1) the

---

"The phrase `*Allen* charge' refers to supplemental jury instructions that urge deadlocked juries to forego their differences in order to reach a unanimous verdict. The original *Allen* charge urged the minority of the jury to consider the views of the majority in an effort to determine whether the minority views were reasonable under the circumstances." *Boyd*, 45 F.3d at 878 (citing *Allen v. United States*, 164 U.S. 492, 501, 17 S. Ct. 154, 157, 41 L. Ed. 528 (1896); *see also United States v. Anderton*, 679 F.2d 1199, 1202 (5th Cir. 1982) ("An *Allen* charge, as all criminal law devotees know, is a sharp punch to the jury, reminding them of the nature of their duty and the time and expense of a trial, and urging them to try again to reach a verdict."). An *Allen* charge is also referred to as a "dynamite" charge. *See, e.g., United States v. Bailey*, 468 F.2d 652, 666 (5th Cir. 1972) ("By whatever label identified))the *Allen* charge, the dynamite charge, the third degree instruction, the shotgun instruction, or the nitroglycerin charge))the standard supplemental instruction has been well-received by the nation's trial court judges. The charge is used precisely because it works, because it can blast a verdict out of a jury otherwise unable to agree that a person is guilty."), *aff'd on reh'g en banc*, 480 F.2d 518 (5th Cir. 1973).

-5-

semantic deviation from approved "*Allen*" charges cannot be so prejudicial to the defendant as to require reversal, and (2) the circumstances surrounding the giving of an approved "*Allen*" charge must not be coercive.'" *Lindell*, 881 F.2d at 1321 (quoting *United States v. Bottom*, 638 F.2d 781, 787 (5th Cir. 1981)).

In the habeas context, in contrast, the standard for disturbing a state conviction is considerably stricter; a habeas petitioner must establish that the court's charge, under the totality of the circumstances, was so coercive as to have unconstitutionally rendered the petitioner's trial fundamentally unfair. *Boyd*, 45 F.3d at 881.[4] Thus, we evaluate the constitutionality of a state court's supplemental instructions by comparing them to other charges challenged on constitutional grounds in habeas corpus cases, not by focusing on deviations from charges approved of on direct appeal. *See id.* at 881-84.[5] In

---

The Supreme Court has explained the distinction between the standard for reversible error on direct appeal from a federal criminal conviction and the constitutional standard for challenging a state court conviction in habeas corpus as follows:

> [E]ven substantial unanimity among federal courts of appeals that the instruction in question ought not to be given in United States district courts within their respective jurisdictions is not, without more, authority for declaring that the giving of the instruction makes a resulting conviction invalid under the Fourteenth Amendment. Before a federal court may overturn a conviction resulting from a state trial in which this instruction was used, it must be established not merely that the instruction is undesirable, erroneous, or even "universally condemned," but that it violated some right which was guaranteed to the defendant by the Fourteenth Amendment.

*Cupp v. Naughten*, 414 U.S. 141, 146, 94 S. Ct. 396, 400, 38 L. Ed. 2d 368 (1973).

> *See also United States v. Cheramie*, 520 F.2d 325 (5th Cir. 1975). This Court, pursuant to its general supervisory powers, can restrict the utilization in this Circuit of supplemental instructions more narrowly than would otherwise be required by the United States Constitution. However, because this supervisory jurisdiction does not extend to state courts, we apply only the constitutional

-6-

*Boyd*, we reversed a district court's grant of habeas relief based on an allegedly coercive *Allen* charge, holding that while similar, "almost identical" instructions had been held reversible error on direct appeal, the supplemental charge was not so coercive as to have rendered the petitioner's trial fundamentally unfair. *Id.* at 884.

The trial court's supplemental instruction in Montoya's case was not a traditional *Allen* charge; it did not contain what we have called "the most troublesome feature of the Allen charge))the exhortation to the minority to reexamine its views in light of the majority's arguments," *United States v. Cheramie*, 520 F.2d 325, 330-31 (5th Cir. 1975), and it did not "remind[] [the jury] of the nature of their duty and the time and expense of a trial, and urg[e] them to try again to reach a verdict," *United States v. Anderton*, 679 F.2d 1199, 1202 (5th Cir. 1982).[6] The trial court simply stated, "Would you please deliberate for another 30 minutes to see if you are able to reach an answer to the special issues in

---

standard in habeas corpus actions arising from state criminal prosecutions.
*Id.* at 330 n.6 (citations omitted).

*See United States v. Warren*, 594 F.2d 1046, 1050 (5th Cir. 1979) (noting that court's instruction to jury to continue deliberating, in response to two notes suggesting jury was deadlocked, was not traditional *Allen* charge); *see also United States v. Williams*, 626 F.2d 697, 704 (9th Cir. 1980) (holding that court's restatement of its instructions after jury notified trial judge of its inability to reach a verdict was not modified *Allen* charge), *cert. denied*, 449 U.S. 1020, 101 S. Ct. 586, 66 L. Ed. 2d 482 (1980). *Cf. Cheramie*, 520 F.2d at 329 n.3 ("It might be argued that the terse charge objected to here is so lacking in the elements composing either the Fifth Circuit's approved version or the original `Allen' pronouncement that this Court should not subsume its analysis under the banner of the traditional `Allen' cases. For example, no reference was made by the trial judge regarding the expense of trial, or the need for minority reconsideration of their votes. While this view presents an interesting definitional question, the denomination of the charge is of only tangential importance.").

accordance with the Court's instructions and please report to me after that."

Regardless of the label we attach to the court's supplemental instruction, we emphasize that the instruction contained none of the explicit "dynamite" language contained in more traditional *Allen* charges. In *Boyd*, we reviewed a habeas petitioner's challenge to an *Allen* charge in which the court instructed the jury to continue its deliberations, informing the jury that its verdict "should represent the opinion of each individual juror," but explicitly instructing the dissenting jurors to reconsider their views in light of those of the majority. *Id.* at 878. The petitioner specifically objected to the following language: "The issue has been tried out very ably by both sides, who have presented this evidence to you, and *a decision has to be reached by a jury. You are that jury,* and it seems to me that you ought to make every effort to arrive at a unanimous verdict and reach a conclusion." *Id.* at 878. We noted that the trial court's instruction resembled other *Allen* charges that we had held constituted reversible error on direct review. However, we held that the court's charge did not deprive the defendant of a fundamentally fair trial, reasoning that the instruction, in context, "did more to *encourage* the jurors to reach a verdict than it did to coerce them." *Id.* at 883-84.[7]

_____

We also stated that:
In addition, after reviewing the additional circumstances surrounding the charge, we are even more firmly convinced that any coerciveness generated by the court's instruction fell short of the level of a constitutional violation. The jury deliberated between

In *Lowenfield v. Phelps*, 484 U.S. 231, 108 S. Ct. 546, 98 L. Ed. 2d 568 (1988), the Supreme Court held that the state trial court had not unconstitutionally coerced the jury when it (1) inquired as to how many jurymembers felt that further deliberations would help them arrive at a verdict; and then (2) gave the jury a modified *Allen* charge.[8]  The Supreme Court held that, although the jury returned its verdict thirty minutes after the court gave them the supplemental instruction, "the combination of the polling of the jury and the supplemental instruction was not `coercive' in such a way as to deny petitioner any constitutional right." *Id.* at 241, 108 S. Ct. at 552.  The Court specifically noted that the supplemental instruction did not inform the jury that it was required to reach a verdict.  *Id.* at 239, 108 S. Ct. at 551-52.

In *Bryan v. Wainwright*, 511 F.2d 644 (5th Cir.), *cert. denied*, 423 U.S. 837, 96 S. Ct. 63, 46 L. Ed. 2d 55 (1975), we held that a district court had erroneously granted habeas relief on a claim

4 1/2 and 5 hours before it notified the court that it was deadlocked.  Only after hearing that the jury was deadlocked did the court read the *Allen* charge and encourage the jury to continue deliberating.  Approximately one hour and twenty minutes after hearing that charge the jury returned with its verdict. *Id.* at 884.

> The court instructed the jury:
> When you enter the jury room it is your duty to consult with one another to consider each other's views and to discuss the evidence with the objective of reaching a verdict if you can do so without violence to that individual judgment.
> Each of you must decide the case for yourself but only after discussion and impartial consideration of the case and impartial consideration of the case with your fellow jurors.  You are not advocates for one side or the other.  Do not hesitate to reexamine your own views and to change your opinion if you are convinced you are wrong but do not surrender your honest belief as to the weight and effect of evidence solely because of the opinion of your fellow jurors or for the mere purpose of returning a verdict.

*Id.* at 235, 108 S. Ct. at 549.

that the state trial court had coerced the jury into rendering a verdict. In that case, the trial court had given the jury an *Allen* charge in which the court explicitly instructed the minority jurors to reconsider their views. After six hours, the court again called the jury into the courtroom, "whereupon the following discussion took place:

> THE COURT: Ladies and Gentlemen of the Jury, do you believe that you can arrive at a verdict in a short period of time? JUROR: I believe we're closer to it than we were. I have that idea. The COURT: If I give you another 20 minutes, will that be enough? You want to give it a try for 20 minutes? JUROR: All right. THE COURT: All right. We'll give you another 20 minutes and see if you can arrive at a verdict within the next 20 minutes. You can retire to the jury room.

*Id.* at 645. After seventeen minutes, the jury returned a guilty verdict. *Id.* We held that the court's instruction, combined with the ensuing dialogue regarding an additional twenty-minute period of deliberations "was not so prejudicial as to make the trial fundamentally unfair." *Id.* at 646.

The trial court's instruction in this case was substantially less coercive than the *Allen* charges held constitutional in *Boyd* and *Bryan*. Unlike the instructions in *Boyd* and *Bryan*, the state trial court's instruction in Montoya's case was not directed to the minority or dissenting jurors. Unlike the instruction in *Boyd*, the trial court's instruction did not contain language suggesting that the jury was required to reach a verdict. Instead, the court's instruction simply asked the jury to deliberate for another half hour "to see if you are able to reach an answer to the special

-10-

issues."[9]

Montoya further argues that the fact that the jury returned its verdict forty minutes after receiving the court's supplemental instruction suggests it was coerced by the court's supplemental instruction. While the time a jury deliberates after receiving a supplemental instruction is a factor to consider, *Lowenfield*, 484 U.S. at 240, 108 S. Ct. at 552, we do not agree that the fact that the jury arrived at unanimous answers to the special issues after forty minutes of deliberations indicates that the court's instruction was unconstitutionally coercive, *see id.* (holding supplemental instruction constitutional where jury rendered verdict thirty minutes after receiving instruction); *Boyd*, 45 F.3d at 884 (same, one hour and twenty minutes); *Bryan*, 511 F.2d at 645 (same,

---

We note that the state trial court's supplemental instruction also did not contain countervailing language, like that contained in the *Allen* charges at issue in *Boyd*, *Lowenfield*, and *Scott*, to the effect that a juror should not merely acquiesce in the majority's view. In the direct appeal context, we have suggested that such countervailing language is required in a traditional *Allen* charge, *see Posey v. United States*, 416 F.2d 545, 552 (5th Cir. 1969), *cert. denied*, 397 U.S. 946, 90 S. Ct. 964, 25 L. Ed. 2d 127 (1970), and at least one circuit court has "looked with favor" on such language in reviewing state court supplemental instructions in the habeas context. *See Ellis v. Reed*, 596 F.2d 1195, 1200 (4th Cir. 1979).

Montoya does not argue that the trial court erred in not including such language, and we have found no authority suggesting that it is constitutionally required, either in the context of a traditional *Allen* charge, or a simple instruction to continue deliberating like the charge in this case. Further, we have found no evidence that such language, in the absence of the "dynamite" language of a traditional *Allen* charge, is required in federal criminal trials in this circuit. *See United States v. Straach*, 987 F.2d 232, 242-43 (5th Cir. 1993) (holding that trial court's instruction to jury to continue deliberating after jury informed court that it had reached verdict on counts two through five but was unable to reach verdict on count one was not reversible error where trial court's instruction "simply said, `Members of the jury: Considering the length of the trial and the amount of evidence to be considered, the Court requests that you continue your deliberations in an effort to reach a verdict on all counts'"); *United States v. Warren*, 594 F.2d 1046, 1050 (5th Cir. 1979) (holding that trial court's instructions to "continue deliberations" were not traditional *Allen* charges and not reversible error).

-11-

seventeen minutes).[10]

Montoya also contends that the trial court's supplemental instruction was rendered unconstitutionally coercive because it followed the court's inquiry into the jury's numerical division. The trial court asked the jury, "Without telling me for what answer the jury has cast its votes, could you please indicate what the numerical vote is for each special issue?", and the jury responded that it was divided nine to three on the first special issue, and ten to two on the second.

Although in *Brasfield v. United States*, 272 U.S. 448, 47 S. Ct. 135, 71 L. Ed. 345 (1926), the Supreme Court held that such an inquiry was *per se* reversible error on direct review of a federal criminal conviction, *id.* at 450, 47 S. Ct. at 135-36, every court of appeals that has addressed the issue has held that *Brasfield*'s *per se* rule does not apply in the habeas context, *see Williams v. Parke*, 741 F.2d 847, 851 (6th Cir. 1984), *cert. denied*, 470 U.S. 1029, 105 S. Ct. 1399, 84 L. Ed. 2d 787 (1985); *Locks v. Sumner*, 703 F.2d 403, 406-07 (9th Cir.), *cert. denied*, 464 U.S. 933, 104 S.

_____

Montoya also argues that the trial court's "deadline" rendered its supplemental instruction coercive. The trial court did not instruct the jury that it was required to reach a verdict in thirty minutes; rather, it instructed to jury to continue deliberating for thirty minutes and then report back to the court. Under the circumstances, such an instruction may in fact have rendered the supplemental instruction less coercive by suggesting to the holdout jurors that the end was in sight. In any event, while a deadline on jury deliberations may constitute reversible error on direct review, *see United States v. Amaya*, 509 F.2d 8 (5th Cir. 1975), *cert. denied*, 429 U.S. 1101, 97 S. Ct. 1125, 51 L. Ed. 2d 551 (1977), a deadline does not necessarily render a state criminal trial fundamentally unfair, *see Bryan*, 511 F.2d at 645. In *Bryan*, the trial court sua sponte summoned the jury into the courtroom and gave the jury an *Allen* charge. Six hours later, the court again called the jury into the court room, and gave the jury "another 20 minutes" to "see if you can arrive at a verdict within the next 20 minutes." *Id.* at 645. We held that the trial court's conduct "was not so prejudicial as to make the trial fundamentally unfair." *Id.* at 646.

-12-

Ct. 338, 78 L. Ed. 2d 307 (1983); *United States ex rel. Kirk v. Director, Dep't of Corrections*, 678 F.2d 723, 727 (7th Cir. 1982); *Cornell v. Iowa*, 628 F.2d 1044, 1048 (8th Cir. 1980), *cert. denied*, 449 U.S. 1126, 101 S. Ct. 944, 67 L. Ed. 2d 112 (1981); *Ellis v. Reed*, 596 F.2d 1195, 1200 (4th Cir.), *cert. denied*, 444 U.S. 973, 100 S. Ct. 468, 62 L. Ed. 2d 388 (1979).[11]  We agree with those courts that an inquiry into the numerical division of the jury warrants federal habeas relief only if, under the totality of the circumstances, the inquiry, coupled with a subsequent charge, rendered the petitioner's trial fundamentally unfair. *See, e.g., Williams*, 741 F.2d at 851; *Cornell*, 628 F.2d at 1048.

Montoya correctly points out that an inquiry into the numerical division of the jury during the penalty phase of a Texas capital trial creates additional risks not present in a non-capital trial or in the guilt/innocence phase of a capital trial. Consistent with the Texas special issues statute, the trial court instructed the jury that if ten jurors or more vote "no" as to any special issue, then the answer should be "no" to that issue, while the jury must be unanimous to vote "yes."  *See* Tex. Crim. Proc. Code Ann. art. 37.071(d).  Thus, when a jury reveals that it is divided ten to two or eleven to one on a special issue and that it has not answered that issue, its numerical split will necessarily communicate to the trial court that the majority favors "yes."  In

_____

        *See also Lowenfield*, 484 U.S. at 240 n.3, 108 S. Ct. at 552 n.3 ("Our decision in *Brasfield* makes no mention of the Due Process Clause or any other constitutional provision.  The Federal Courts of Appeals have uniformly rejected the notion that *Brasfield's per se* reversal approach must be followed when reviewing state proceedings on habeas corpus." (citing cases)).

denying habeas relief based on a state court's inquiry into the jury's numerical division, other circuits have emphasized that the court did not ascertain which verdict the majority favored. *Compare Jones v. Norvell*, 472 F.2d 1185, 1185-86 (6th Cir.) (per curiam), *cert. denied*, 411 U.S. 986, 93 S. Ct. 2275, 36 L. Ed. 2d 964 (1973) (holding that state trial court coerced jury in part because it ascertained the jury's numerical division and how the majority voted) *with Williams*, 741 F.2d at 851 (holding that state trial court had not coerced jury and distinguishing *Jones* in part on grounds that court inquired as to jury's numerical division without asking how many jurors favored a guilty verdict); *see also Cornell*, 628 F.2d at 1048 (holding state trial court's inquiry into numerical division of jury constitutional in part because court did not inquire and was not told whether majority favored acquittal).

In Montoya's case, although the court asked the jury, "*Without telling me for what answer the jury has cast its votes*, could you please indicate what the numerical vote is for each special issue?" (emphasis added), the jury's answer risked communicating which answer the majority favored because it was divided ten to two on the second special issue. However, this risk was substantially undercut by the fact that the jury did not, as Montoya contends, clearly communicate to the trial court that it was unable to reach an answer with respect to either special issue. The jury's note simply stated, "We have not been able to reach a unanimous decision on yes or no." Furthermore, regardless of whether the trial court suspected that a majority of the jury favored "yes" on each special

-14-

issue, it is by no means certain that the jury would have deduced that its numerical division implied to the court how each side stood. Therefore, the court's inquiry, which explicitly disclaimed a desire to know how the jury stood, was less coercive than an explicit request as to which answer the majority favored.

On balance, we conclude that the state trial court's instruction to the jury to continue deliberating for thirty minutes, following its inquiry as to the numerical division of the jury with respect to each special issue, was not under the circumstances so coercive as to have rendered Montoya's trial fundamentally unfair. While we have not previously addressed identical circumstances in this circuit, the weight of authority in other circuits supports our holding. *Compare Williams*, 741 F.2d at 851-52;[12] *Cornell*, 628 F.2d at 1048;[13] *Ellis*, 596 F.2d at 1197;[14]

_____

In *Williams*, the state trial court had given the jury a modified *Allen* charge after inquiring into the jury's numerical division, which the jury informed the court was seven to five. The jury returned a verdict within thirty minutes of receiving the instruction. The Sixth Circuit noted that the state trial court's instruction did not "expressly remind jurors of their continuing right to disagree," *id.* at 851, which the Sixth Circuit had held on direct appeal to be "one of the most important parts of the *Allen* charge," *id.* (quoting *United States v. Scott*, 547 F.2d 334, 337 (6th Cir. 1977)). However, the Sixth Circuit distinguished its direct appeal cases as "turning on this court's exercise of its supervisory powers." *Id.* at 851. It also emphasized that the state trial court's instruction did not single out minority jurors and did not suggest that the jury was required to agree. *Id.* at 850-51. The court thus held that the state trial court's instruction, following an inquiry into the numerical division of the jury, while "less than ideal," *id.* at 850, was not "so coercive as to deprive petitioner of his constitutional rights," *id.* at 852.

In *Cornell*, the Eighth Circuit reversed the district court's grant of habeas relief in a case involving an inquiry into the jury's numerical division (seven to five) and a balanced *Allen* charge. The court held that "neither the inquiry nor the *Allen* charge, nor the two in combination, was coercive of the jury's ultimate verdict of guilty." The court emphasized that:

> The judge did not ask nor was he told whether the majority at that time favored acquittal or which offense was being considered. The supplemental charge that was given was mildly worded and did not address itself to the minority members of the jury. Finally, nearly five hours elapsed between the time the supplemental instruction was

-15-

*Locks*, 703 F.2d at 407[15] with *Jones*, 472 F.2d at 1186.[16]

In *Jiminez v. Myers*, 40 F.3d 976 (9th Cir. 1993) (per curiam), *petition for cert. filed*, 63 U.S.L.W. 3861 (U.S. May 22, 1995) (No. 94-1934), Montoya's strongest support for his claim, the Ninth Circuit reversed a denial of habeas relief on facts similar in some respects to those in this case. However, in *Jiminez*, the state trial court had repeatedly inquired into the jury's numerical split, expressed approval of the jury's movement from nine-to-three to eleven-to-one, and then instructed the jury to continue deliberating until the end of the day. *Id.* at 979. The Ninth

---

given and the time the jury returned its verdict. *Id.* at 1048.

       In *Ellis*, the Fourth Circuit affirmed a denial of habeas relief in a case in which the state trial court had inquired into the jury's numerical division, which the court learned was eleven to one, and had given the jury a mild *Allen* charge. The jury returned a verdict within eight minutes after receiving the supplemental instruction. The Fourth Circuit held that "neither the inquiry as to the numerical division of the jury nor the supplemental modest charge had the coercive effect attributed to them by the appellant," and noted that "we look with particular favor upon the two admonitions in the modified *Allen* charge that no jury surrender any conscientious convictions." *Id.* at 1200.

       In *Locks*, the Ninth Circuit affirmed the denial of habeas relief in a case in which the state trial court inquired as to the jury's numerical division (eight to three to one) and then dismissed the jury for the weekend. *Id.* at 405. The Ninth Circuit held that the trial court's inquiry into the jury's numerical division was not coercive, noting that "he did not ask whether the jurors in the majority were for acquittal or a guilty verdict; the judge did not follow the inquiry with any statement imploring the jury to come to a decision; and the jury was not sent back to continue deliberations, but was dismissed for the weekend." *Id.* at 407.

       In *Jones*, the Sixth Circuit reversed a district court's denial of habeas relief in a case in which the trial court had inquired not only as to the split but also the majority's inclination and asserted that "it is your duty to reach a verdict if you can possibly do so))you 12 people are the only ones that can do it. The Court can't do it, nor anyone else. You twelve people are the only ones." *Id.* at 1185. In addition, the jury had returned a guilty verdict within five minutes of receiving the court's supplemental charge. The Sixth Circuit held that the state trial court's "identification of a deadlocked jury's majority-minority count" and "coercive jury charge," and "the speedy return of a verdict" constituted a totality of circumstances which violated the petitioner's constitutional rights. *Id.* at 1186.

-16-

Circuit held that the state trial court's "comments and conduct amounted to giving the jury a de facto *Allen* charge." *Id.* at 980. The court then reasoned that the trial court's instruction "sent a clear message that the jurors in the majority were to hold their position and persuade the single hold-out juror to join in a unanimous verdict, and the hold-out juror was to cooperate in the movement toward unanimity." *Id.* at 981.

Although the facts in *Jiminez* are distinguishable on the grounds that the trial court in this case did not repeatedly inquire into the jury's "split" or express approval of its movement toward unanimity, we also question the persuasiveness of the Ninth Circuit's reasoning. *See id.* at 981 (Kozinski, J., dissenting) (characterizing as "sheer phantasy" majority's assessment of the effect of the trial court's instructions).

In sum, guided by *Lowenfield*, *Boyd*, and *Bryan*, we hold that the trial court's inquiry into the numerical division of the jury and its supplemental instruction to continue deliberating for another thirty minutes were not so coercive as to have rendered Montoya's trial fundamentally unfair. Although its inquiry into the numerical division of the jury was potentially more coercive than such an inquiry would have been in the context of a jury's deliberations over a guilt/innocence verdict, the court's supplemental instruction to continue deliberating for thirty minutes "to see if you can reach an answer to the special issues" was less coercive than the instructions at issue in *Boyd* and *Bryan*. While it lacked protective language assuring minority jurors that

they were not required to relinquish firmly held convictions, the court's instruction contained none of the "dynamite" language of a traditional *Allen* charge. Under the totality of circumstances surrounding the court's communications with the jury, we hold that the trial court's instruction was not so coercive as to have rendered Montoya's trial fundamentally unfair. Consequently, we hold that the district court erred in granting Montoya's request for habeas relief on the grounds that the state trial court unconstitutionally coerced the jury into answering "yes" to the special issues.[17]

B

Scott also challenges the district court's holding that the state trial court unconstitutionally instructed the jury on Texas' "law of parties" because Montoya had not been charged with conspiracy to commit murder. The trial court instructed the jury, under Texas' "law of parties" statute, Tex. Penal Code Ann. § 7.02

---

Montoya also argues that the trial court's instruction to the jury to continue deliberating was improper because under the Texas death penalty statute, "if the jury is unable to answer any special issue, the defendant is to be assessed a life sentence," *Montoya v. State*, 810 S.W.2d 160, 166 (Tex. Crim. App. 1989), *cert. denied*, 502 U.S. 961, 112 S. Ct. 426, 116 L. Ed. 2d 446 (1991). Montoya contends that the trial court erred in not sentencing him to life imprisonment after the jury first indicated that it had deadlocked. The Texas Court of Criminal Appeals rejected this claim, holding that "[u]nless the record reveals that the trial court abused its discretion in holding the jury for deliberations, reversal is not mandated." *See id.* In any event, errors of state law are not grounds for granting habeas relief. *Estelle v. McGuire*, 502 U.S. 62, 67-68, 112 S. Ct. 475, 480, 116 L. Ed. 2d 385 (1991).

To the extent Montoya argues that the trial court's failure to render a life imprisonment sentence violated his constitutional rights, we note that we rejected a similar argument in *Monroe v. Blackburn*, 748 F.2d 958 (5th Cir. 1984), *cert. denied*, 476 U.S. 1145, 106 S. Ct. 2261, 90 L. Ed. 2d 706 (1986), a case in which the state trial court, in a Louisiana capital case, did not impose a life sentence after the jury deadlocked during the sentencing phase of petitioner's trial. We noted that the Louisiana courts had rejected Monroe's claim as a matter of state law, and we held: "We accept that decision and reject the argument that a constitutional deprivation occurred." *Id.* at 961.

(West 1994), on an "aiding and abetting" theory of criminal liability, *see* § 7.02(a)(2), and a conspiracy theory of criminal liability, *see* § 7.02(b).[18]  Under section 7.02(b) of the Texas Penal Code:

> If, in the attempt to carry out a conspiracy to commit one felony, another felony is committed by one of the conspirators, all conspirators are guilty of the felony actually committed, though having no intent to commit it, if the offense was committed in furtherance of the unlawful purpose and was one that should have been anticipated as a result of the carrying out of the conspiracy.

Tex. Penal Code Ann. § 7.02(b).  We have held that Texas' "law of parties" may support a conviction for capital murder. *See Skillern v. Estelle*, 720 F.2d 839, 846-47 (5th Cir. 1983), *cert. denied*, 469 U.S. 873, 105 S. Ct. 224, 83 L. Ed. 2d 153 (1984).

Our recent decision in *Jacobs v. Scott*, 31 F.3d 1319 (5th Cir. 1994), *cert. denied*, ___ U.S. ___, 115 S. Ct. 711, 130 L. Ed. 2d 618 (1995), forecloses the district court's holding.  Like Montoya, Jacobs was convicted of capital murder after the trial court gave the jury a "law of parties" conspiracy instruction under § 7.02(b). *Id.* at 1322.  Jacobs argued "that the trial court erred by charging the jury at the guilt phase on a conspiracy theory of liability even though the indictment contained no such charge." *Id.* at 1329. We rejected this argument, which is identical to Montoya's,

---

Montoya's brief erroneously suggests that a "law of parties" instruction is distinct from a conspiracy instruction.  He contends, quoting the court's instruction, that the court instructed the jury on the law of parties and conspiracy.  In fact, the court instructed the jury on aiding and abetting, under § 7.02(a)(2), and conspiracy, under § 7.02(b), both of which are "law of parties" instructions.  *See Jackson v. State*, 898 S.W.2d 896, 898 (Tex. Crim. App. 1995) (referring to "the law of parties as it is set out in both . . . § 7.02(a)(2) and in § 7.02(b)").

stating:

> We have held that "one who has been indicted as a principal may, on proper instructions, be convicted on evidence showing only that he aided and abetted the commission of the offense."  *United States v. Robles-Pantoja*, 887 F.2d 1250, 1255 (5th Cir. 1989) (citations omitted).  Similarly, it was not error for Jacobs to be indicted as a principal and then to be convicted under the "law of the parties."

*Id.*  Under *Jacobs*, Montoya is not entitled to habeas relief based on the trial court's § 7.02(b) instruction.

III

A

In his cross-appeal, Montoya argues first that the district court erroneously rejected his eighth claim, in which he contended that the trial court's jury instructions prevented the jury from considering his mitigating evidence that he was not the principal actor in the murder.  "The Eighth Amendment requires that the jury be able to consider and give effect to all relevant mitigating evidence offered by petitioner."  *Boyde v. California*, 494 U.S. 370, 377-78, 110 S. Ct. 1190, 1196, 108 L. Ed. 2d 316 (1990) (citing *Lockett v. Ohio*, 438 U.S. 586, 98 S. Ct. 2954, 57 L. Ed. 2d 973 (1978); *Eddings v. Oklahoma*, 455 U.S. 104, 102 S. Ct. 869, 71 L. Ed. 2d 1 (1982); *Penry v. Lynaugh*, 492 U.S. 302, 109 S. Ct. 2934, 106 L. Ed. 2d 256 (1989)).

Montoya argues that because the trial court instructed the jury on Texas' "law of parties" but failed to clarify that the "law of parties" does not apply during the penalty phase of his trial, the jury was precluded from considering or giving effect to his

mitigating evidence that Villavicencio and not he killed Kilheffer. In *Boyde*, the Supreme Court clarified its standard for such a claim: "We think the proper inquiry in such a case is whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way that prevents the consideration of constitutionally relevant evidence." *Id.* at 380, 110 S. Ct. at 1198; *see Johnson v. Texas*, ___ U.S. ___, ___, 113 S. Ct. 2658, 2669, 125 L. Ed. 2d 290 (1993) (holding that petitioner's *Penry/Eddings/Lockett* claim with respect to Texas special issues was governed by *Boyde* standard).

We have repeatedly rejected claims similar to Montoya's, holding that if a jury believed that the defendant's accomplice killed the murder victim, it could answer "no" to either of the first two Texas special issues. *See Harris v. Collins*, 990 F.2d 185, 188-89 (5th Cir.), *cert. denied*, ___ U.S. ___, 113 S. Ct. 3069, 125 L. Ed. 2d 746 (1993); *Stewart v. Collins*, 978 F.2d 199, 201 (5th Cir. 1992), *cert. denied*, ___ U.S. ___, 113 S. Ct. 1951, 123 L. Ed. 2d 656 (1993); *Bridge v. Collins*, 963 F.2d 767, 770 (5th Cir. 1992), *cert. denied*, ___ U.S. ___, 113 S. Ct. 3044, 125 L. Ed. 2d 729 (1993). In *Stewart* we held:

> [The petitioner] does not satisfy his burden of demonstrating a "reasonable likelihood that the jury . . . appli[ed] the challenged instructions in a way that prevent[ed] the consideration of constitutionally relevant evidence." *Boyde v. California*, 494 U.S. 370, 371, 110 S. Ct. 1190, 1191, 108 L. Ed. 2d 316 (1990). The punishment phase issues allowed the jury to give mitigating effect to [the petitioner's] alleged non-triggerman status if they chose to credit his version of the offense.

*Id.* at 201. Our holding in *Stewart* forecloses Montoya's claim.

B

Montoya argues next that the trial court's instructions unconstitutionally prevented the jury from giving mitigating effect to the fact that if he had been sentenced to life in prison, he would have been required to serve twenty years in prison before becoming eligible for parole. At the penalty phase, the trial court instructed the jury not to consider Montoya's eligibility for parole, as Texas law required it to do, *O'Bryan v. Estelle*, 714 F.2d 365, 388 (5th Cir. 1983) ("Under Texas law, a jury may not consider the possibility of parole in its deliberation on punishment."), *cert. denied*, 465 U.S. 1013, 104 S. Ct. 1015, 79 L. Ed. 2d 245 (1984). Montoya's claim relies on the Supreme Court's holding in *Simmons v. South Carolina*, ___ U.S. ___, 114 S. Ct. 2187, 129 L. Ed. 2d 133 (1994), that when a defendant convicted of capital murder is statutorily ineligible for parole, the due process clause entitles him to rebut the prosecution's "future threat to society" evidence with his statutory ineligibility for parole. *Id.* at ___, 114 S. Ct. at 2194-96.[19]

Montoya's *Simmons* claims are foreclosed by recent circuit authority rejecting an extension of *Simmons* beyond situations in which a defendant is statutorily ineligible for parole. In *Allridge v. Scott*, 41 F.3d 213 (5th Cir. 1994), *cert. denied*, ___

---

Although in *Simmons* the Supreme Court specifically limited its holding to the due process clause of the fourteenth amendment, expressing "no opinion on the question whether [its] result [was] also compelled by the Eighth Amendment," *id.* at ___, 114 S. Ct. at 2193 n.4, Montoya states his *Simmons* claim as both a fourteenth amendment claim and an eighth amendment claim.

U.S. ___, 115 S. Ct. 1959, 131 L. Ed. 2d 851 (1995), a habeas petitioner had been prevented from arguing to the jury that he was almost certain not to be granted parole. He argued that under *Simmons*, the trial court's exclusion of his evidence and "refusal to instruct the . . . jury that [petitioner] almost certainly would serve the remainder of his life in prison" violated his fourteenth amendment right to due process. *Id.* at 220. We rejected his claim, reading *Simmons* "to mean that due process requires the state to inform a sentencing jury about a defendant's parole ineligibility when, *and only when*, (1) the state argues that a defendant represents a future danger to society, and (2) the defendant is legally ineligible for parole." *Id.* at 222 (footnote omitted); *see also id.* at 222-23 (rejecting similar claim asserted as eighth amendment *Penry* claim). We also noted that an extension of *Simmons* to encompass situations in which a defendant was eligible for parole would be barred under *Teague v. Lane*, 489 U.S. 288, 109 S. Ct. 1060, 103 L. Ed. 2d 334 (1989). *Id.* at 222 n.11.[20]

C

Montoya also argues that the district court erroneously denied him discovery and an evidentiary hearing on his claim that one of

---

In *Kinnamon v. Scott*, 40 F.3d 731 (5th Cir.), *cert. denied*, ___ U.S. ___, 115 S. Ct. 660, 130 L. Ed. 2d 595 (1994), we similarly declined to extend *Simmons* beyond statutory ineligibility for parole:

> [Petitioner] next asserts constitutional error in his inability to argue to the jury in sentencing that if spared the death penalty [petitioner] would be required to serve a minimum of 20 calendar years without good time before becoming eligible for parole. [Petitioner] rests this claim on *Simmons* . . . . If we were to ignore the absence of a contemporaneous objection and the bar of *Teague* . . . , we would not extend *Simmons* beyond cases in which the sentencing alternative to death is life without parole.

*Id.* at 733.

the jurors who convicted Montoya knew the victim.  "The opportunity for an evidentiary hearing in a federal habeas corpus proceeding is mandatory only where there is a factual dispute which, if resolved in the petitioner's favor, would entitle the petitioner to relief and petitioner has not received a full and fair evidentiary hearing in state court."  *East v. Scott*, 55 F.3d 996, 1000 (5th Cir. 1995) (citing *Townsend v. Sain*, 372 U.S. 293, 83 S. Ct. 745, 9 L. Ed. 2d 770 (1963), *overruled in part on other grounds*, *Keeney v. Tamayo-Reyes*, 504 U.S. 1, 112 S. Ct. 1715, 118 L. Ed. 2d 318 (1992)).

In *East*, we reviewed a district court's denial of a request for discovery and an evidentiary hearing, and we follow a similar approach in this case.  First, we examine the legal basis for the petitioner's claim to determine whether the petitioner's allegations state a prima facie due process claim.  *East*, 55 F.3d at 1000-01.  Second, we determine whether the petitioner's allegations, which must be specific and may not be speculative or conclusory, establish "good cause" for discovery under Rule 6(a) of the Federal Rules Governing § 2254 Cases.  *Id.* at 1001-02.[21]

Thus, the first question we must address is whether Montoya's allegations are sufficient to establish a prima facie due process claim.  In his amended habeas petition, Montoya alleged:

> All jurors were asked at voir dire whether they knew the alleged victim, John E. Kilheffer.  No juror admitted any

---

If so, then a remand is in order for the petitioner to pursue his requested discovery.  Then, after discovery, the district court will be required to determine whether an evidentiary hearing is necessary, that is, whether genuine issues of material fact remain.  *Id.* at 1002 (citing *Ward v. Whitley*, 21 F.3d 1355, 1367 (5th Cir. 1994), *cert. denied*, ___ U.S. ___, 115 S. Ct. 1257, 131 L. Ed. 2d 137 (1995)).

knowledge of him. In fact, [Juror X] knew Kilheffer, had known him for a while, and admitted this to a fellow juror. Her failure to respond to the court's inquiry on voir dire concealed critical information regarding grounds for striking her for cause and her potential biases and prejudices. . . .

[Juror X's] failure to tell the truth on voir dire is itself evidence of bias. The law implies bias in this situation. In the unlikely event that the court does not find bias as a matter of law, Petitioner will demonstrate actual bias at the evidentiary hearing.

Record on Appeal, vol. 3, at 523.[22] In response to the State's motion for summary judgment, Montoya described his claim in these terms: "[Juror X's] concealment of her acquaintance with the deceased was obviously a failure to answer honestly a material question on voir dire. Further, her friendship with the deceased certainly would have formed the basis of a challenge for cause."

---

Montoya supported these allegations with an affidavit by another juror, Juror Y. In the affidavit, Juror Y states:

At some point during the trial (I believe it was during the guilt/innocence phase deliberations), another juror, who was a young, short, hispanic girl, and I were talking about where we were from and where we worked. This juror, whose first name is _____ and I believe her last name is _____, said she was working, or had worked, at the Yacht Club Restaurant in Port Isabel.

When I learned that [Juror X] worked at the Yacht Club Restaurant, I mentioned that the victim was from South Padre Island and might have frequented the restaurant. I asked [Juror X] if she had ever met him. She responded that she had known him and, in fact, had known him for a while. I got the impression that [Juror X] had known him personally because, for one thing, she referred to him by his first name. I then asked her how she got on the jury if she knew the victim since we had been asked about that before we were selected, but she would no longer talk about it.

At one point, [Juror X] said she was not sure she believed in the death penalty and she also told me that she believed criminals could be rehabilitated. On the other hand, [Juror X] was one of the first to say the defendant deserved the death penalty. In fact, the main reason I am coming forth with this information is because I had the impression she may have been biased towards awarding the death penalty due to her personal connection with the victim.

Record on Appeal, vol. 3, at 531-32. We note that although Scott contends that the affidavit improperly lacked a stamp indicating the expiration date of the notary public's commission, the original affidavit, which appears in the district court record, does contain such a stamp.

Record on Appeal, vol. 1, at 195.[23]

Montoya's claim that Juror X dishonestly failed to reveal her acquaintance with Kilheffer and that this prevented Montoya from challenging her for cause is grounded in the Supreme Court's decision in *McDonough Power Equipment, Inc. v. Greenwood*, 464 U.S. 548, 104 S. Ct. 845, 78 L. Ed. 2d 663 (1984). In that case, a civil case on direct review, a juror had allegedly failed to disclose a material fact. Justice Rehnquist wrote in his plurality opinion that:

> to obtain a new trial is such a situation, a party must first demonstrate that a juror failed to answer honestly a material question on voir dire, and then further show that a correct response would have provided a valid basis for a challenge for cause. The motives for concealing information may vary, but only those reasons that affect a juror's impartiality can truly be said to affect the fairness of a trial.

*Id.* at 556, 104 S. Ct. at 850.[24] The district court evaluated Montoya's juror bias claim under the *McDonough* standard, and Montoya makes no argument on appeal that the court improperly

---

Montoya's discovery request was similarly limited to this issue: In Claim 24, Mr. Montoya alleges that he was deprived of his right to a fair and impartial jury because one juror concealed during voir dire that she knew the alleged victim. This claim is supported by the affidavit of a fellow juror . . . . That affidavit documents a conversation with juror X in which she disclosed the fact that she knew the alleged victim))something she had denied at voir dire. Her deposition is necessary to establish the fact that she failed to disclose at voir dire that she knew the alleged victim. This evidence cannot be gathered by any method short of a deposition. Record on Appeal, vol. 2, at 397.

Although the quoted language appears in a plurality opinion, we have treated the standard as the Court's holding. *See United States v. Ortiz*, 942 F.2d 903, 909 (5th Cir. 1991) ("In *McDonough* . . . , the Supreme Court established a two-pronged test that governs this very situation. In the words of the Court . . . .").

applied that standard to his claim.[25]

We have applied the *McDonough* standard for a claim of juror bias based on failure to disclose a material fact in criminal cases on direct review. *See United States v. Scott*, 854 F.2d 697, 698-700 (5th Cir. 1988) (holding that juror bias warranted new trial where juror knowingly concealed fact that his brother worked in prosecutor's office and parties did not dispute that juror "would have been challenged and excused for cause had he revealed that his brother was a deputy sheriff . . . ."); *United States v. Ortiz*, 942 F.2d 903, 909 (5th Cir. 1991) (noting that juror's "familial ties to employees of law enforcement agencies may well not support a challenge for cause," but holding that juror "answered the voir dire query honestly yet inaccurately," as permitted under *McDonough*), *cert. denied*, 504 U.S. 985, 112 S. Ct. 2966, 119 L. Ed. 2d 587 (1992); *see also United States v. Collins*, 972 F.2d 1385, 1403 (5th Cir. 1992) (declining to apply *McDonough* framework for juror bias claim where alleged misstatement was of subjective belief rather than objective fact), *cert. denied*, ___ U.S. ___, 113 S. Ct. 1812, 123 L. Ed. 2d 444 (1993). Our application of the *McDonough* standard to claims for juror bias on direct appeal from federal convictions does not necessarily mean that we apply an equivalent standard in a habeas case. *See Murphy v. Florida*, 421 U.S. 794, 797-98, 95 S. Ct. 2031, 2035, 44 L. Ed. 2d 589 (1975)

_____

Montoya specifically cited *McDonough* in his state habeas petition, and his federal habeas petition allegations and response to the State's motion for summary judgment track the two prongs of the *McDonough* standard.

-27-

(distinguishing between constitutional standard for reversing conviction based on juror bias and standard applied in Court's exercise of federal supervisory power over federal criminal convictions). However, other circuits have applied *McDonough* in the habeas context,[26] and we assume, arguendo, that a *McDonough* theory of juror bias would be sufficient to obtain federal habeas relief.[27]

Montoya's claim fails on the second prong of the *McDonough* standard because he has failed to establish that Juror X's correct response, that is, that she knew Kilheffer, would have constituted a valid basis for challenging Juror X for cause.[28] Although Montoya alleged in the district court that he could have challenged Juror

---

*See, e.g., Burton v. Johnson*, 948 F.2d 1150, 1159 (10th Cir. 1991) (holding that juror's failure to disclose exposure to family and child abuse denied petitioner fair trial under *McDonough* because juror failed to answer question honestly and correct response would have provided basis for challenge for cause); *Tinsley v. Borg*, 895 F.2d 520, 524-26 (9th Cir. 1990) (same), *cert. denied*, 498 U.S. 1091, 111 S. Ct. 974, 112 L. Ed. 2d 1059 (1991); *Cannon v. Lockhart*, 850 F.2d 437, 440 (8th Cir. 1988) (applying *McDonough* and finding no actual bias based on state court findings, which court held were entitled to presumption of correctness).

We also assume, arguendo, that granting habeas relief on a *McDonough* theory of juror bias would not be barred by the non-retroactivity doctrine of *Teague v. Lane*, 489 U.S. 288, 109 S. Ct. 1060, 103 L. Ed. 2d 334 (1989).

It is also questionable whether Montoya's allegations state a prima facie case with respect to the first prong of the *McDonough* standard, that is, whether Juror X "failed to answer honestly a material question on *voir dire*." *Id.* at 556, 104 S. Ct. at 850. The trial court asked the jury pool whether anyone knew "Mr. Kilheffer" from South Padre Island. No juror responded. The allegations in Juror Y's affidavit may suggest that Juror X realized during the trial that she knew Kilheffer, but they do not necessarily suggest that Juror X realized when she was asked that she knew Kilheffer. Thus, it is speculative whether Juror X (1) lied to get on the jury; or (2) honestly but mistakenly failed to realize she knew Kilheffer when asked. During her examination by counsel at voir dire on an unrelated issue, Juror X referred to the victim as "this man from Padre Island" and not by name. Thus, Montoya's allegations with respect to the first prong may, to some degree, be speculative, and speculative allegations are insufficient to entitle a habeas petitioner to discovery and an evidentiary hearing. *East*, 55 F.3d at 1003.

X for cause had she answered correctly whether she knew Kilheffer, he cited no authority for this contention and makes no such argument on appeal. Challenges for cause in Texas criminal trials are governed by article 35.16 of the Texas Code of Criminal Procedure. *See Butler v. State*, 830 S.W.2d 125, 130 (Tex. Crim. App. 1992) ("We hold that Article 35.16 is a complete list of challenges for cause.").[29] Article 35.16(c) contains two grounds on which a defendant may challenge a venireperson, neither of which applies to this case. Article 35.16(a) lists grounds that either the State or a defendant may assert. Among them, the only arguably applicable basis is the ninth: "That [the venireperson] has a bias or prejudice in favor of or against the defendant."

Consistent with the language of article 35.16(a)(9), the Texas courts have focused on a venireperson's bias in favor of or against the defendant rather than the victim. We have found no published opinion upholding a challenge for cause based on a venireperson's

---

We have looked to state law as the nonexclusive basis to determine the grounds for challenges for cause because those were the grounds applicable to Montoya's trial. We have found no evidence that an independent federal constitutional standard would have provided a valid basis for challenging Juror X in these circumstances for cause over and above Texas law governing challenges for cause. *See, e.g., Patton v. Yount*, 467 U.S. 1025, 1035, 1037 n.12, 104 S. Ct. 2885, 2891, 2891-92 n.12, 81 L. Ed. 2d 847 (1984) (noting federal constitutional standard for determining whether juror's ability to lay aside pre-formed opinion and render verdict based on evidence presented in court makes juror impartial, citing *Irvin v. Dowd*, 366 U.S. 717, 81 S. Ct. 1639, 6 L. Ed. 2d 751 (1961), but holding that state trial court determinations of impartiality are factual findings entitled to a presumption of correctness in federal habeas proceedings). For example, in *Jones v. Butler*, 864 F.2d 348 (5th Cir. 1988), we addressed a habeas petitioner's claim that the state trial court had erroneously denied his challenge for cause to a juror who lived near the victim, knew her by sight, had visited the funeral home to view the body, etc. We noted that under Louisiana law, a juror could be challenged if the juror was "not impartial, whatever the cause of his partiality." *Id*. at 362. We held that the state trial court's implicit finding of impartiality in its denial of the petitioner's challenge for cause was entitled to a presumption of correctness under 28 U.S.C. § 2254(d) and therefore precluded federal habeas relief. *Id*.

mere acquaintance with the victim of the crime for which the defendant has been charged, and the Texas Court of Criminal Appeals has squarely held that the mere fact that a juror knows the victim is not sufficient basis for disqualification. *See Anderson v. State*, 633 S.W.2d 851, 853 (Tex. Crim. App. 1982). In *Anderson*, the juror was a school teacher at the school where the rape at issue occurred and knew the victim, who attended the school, and several of the State's witnesses, but did not know the defendant. The court stated: "Although such knowledge [of the victim] may be the source of an existing bias, `the mere fact that a juror knows, or is a neighbor, or an intimate acquaintance of, and on friendly relations with, one of the parties to a suit, is not sufficient basis for disqualification.'" *Id.* at 853 (quoting *Allbright v. Smith*, 5 S.W.2d 970 (Tex. Comm. App. 1928)).[30]

Because Montoya's allegations fail to establish a prima facie case under *McDonough*, the district court did not abuse its

---

*Accord Williams v. State*, 682 S.W.2d 538, 541-43 (Tex. Crim. App. 1984) (holding that trial court properly rejected challenge for cause to juror who attended church with murder victim and victim's wife, knew of murder victim, and knew, although was not close friend with, victim's wife (citing *Anderson*).

In *Jernigan v. State*, 661 S.W.2d 936 (Tex. Crim. App. 1983), *cert. denied*, 464 U.S. 986, 104 S. Ct. 436, 78 L. Ed. 2d 368 (1983), the Texas Court of Criminal Appeals affirmed a trial court's rejection of a challenge for cause to a venireman who knew the victim "all of his life" and admitted that he might have a "small amount of bias." The court upheld the trial court's ruling under *Anderson*, holding that "[i]n the instant case, as in *Anderson*, the alleged bias was based upon the veniremember's relationship with the victim, and no bias was directed toward appellant." *Id.* at 940. The court acknowledged that the personal relationship was closer than the relationships in *Anderson*. The court also stated, in *dicta*, that "it seems likely that the relationship might have affected [the veniremember's] ability to avoid bias against appellant in considering the questions on punishment once the jury had determined guilt," but noted that "the voir dire was directed entirely to the issue of the determination of guilt or innocence." The voir dire in this case was part of the court's initial questions to the jurors and related generally to the case. However, even if we took the court's dicta as more than just that, the relationship in *Jernigan* was closer than the acquaintance alleged in this case.

discretion in denying Montoya's request for discovery and an evidentiary hearing, *see East*, 55 F.3d at 1003 (affirming denial of request for discovery and evidentiary hearing where petitioner's allegations that district attorney might have known about witness' mental illness were insufficient to support *Brady* claim).

D

Montoya contends next that the trial court, in its instructions to the jury during voir dire, diminished the jury's sense of responsibility for imposing the death penalty by misinforming it of its role in determining whether Montoya should receive the death penalty. In *Caldwell v. Mississippi*, 472 U.S. 320, 105 S. Ct. 2633, 86 L. Ed. 2d 231 (1985), the Supreme Court held that "it is constitutionally impermissible to rest a death sentence on a determination made by a sentencer who has been led to believe that the responsibility for determining the appropriateness of the defendant's death rests elsewhere." *Id.* at 328-29, 105 S. Ct. at 2639. In *Dugger v. Adams*, 489 U.S. 401, 109 S. Ct. 1211, 103 L. Ed. 2d 435 (1989), the Supreme Court clarified its holding in *Caldwell* and held that to "establish a *Caldwell* violation, a defendant necessarily must show that the remarks to the jury improperly described the role assigned to the jury by local law." *Id.* at 407, 109 S. Ct. at 1215; *accord Sawyer v. Butler*, 881 F.2d 1273, 1285 (5th Cir. 1989) (en banc), *aff'd*, 497 U.S. 227, 110 S. Ct. 2822, 111 L. Ed. 2d 193 (1990). In evaluating a *Caldwell* claim, we look to the "total trial scene," including jury selection, the guilt phase of the trial, and the sentencing

-31-

hearing, examining both the court's instructions and counsel's arguments to the jury. *Id.* at 1286-87.

In this case, Montoya points to the trial court's instructions during voir dire, which he suggests minimized the jury's role.[31] The instructions he points to, however, accurately characterize the jury's role under Texas law. Under the Texas death penalty statute in effect at the time of Montoya's conviction, the jury answers the special issues "yes" or "no" and then the trial court imposes the punishment that follows from those answers:

> If the jury returns an affirmative finding on each issue submitted under this article, the court shall sentence the defendant to death. If the jury returns a negative finding on any issue submitted under this article, the court shall sentence the defendant to confinement in the Texas Department of Corrections for life.

Tex. Code Crim. Proc. Ann. art. 37.071(e) (West 1981). Thus, the trial court did not misinform the jury of its role under local law and therefore did not violate *Caldwell*. *See Dugger*, 489 U.S. at 407, 109 S. Ct. at 1215; *Sawyer*, 881 F.2d at 1285.

In addition, the "total trial scene" contains ample

---

The court instructed the jury:
[I]n the event that there's a finding of guilty, then a separate hearing has to be held to determine the punishment to be assessed in the case. And in other felony cases the jury may assess the punishment if the defendant elects to have the jury assess his punishment in the event he is found guilty.
In capital murder cases the jury does not assess punishment. A hearing has to be held and the jury will be asked a couple of questions, and the burden of proof is on the State.
[Reciting special issues.]
Now, if you answer the two questions yes, then the Court, the judge, is required to assess the punishment of death to the accused.
In the event you answer one or both questions no, then the punishment is life in prison, assessed again by the Court, and the jury does not assess the punishment but answers those questions. And then the Court is the one that assesses the punishment. I do, however, need to tell you the effect of your answers to those particular questions.
State Record, vol. IX, at 33-35.

communications to the jury of their responsibility for determining whether Montoya would receive the death penalty.  For example, the prosecutor explicitly asked the potential jurors during voir dire if they understood that the jury's answers to the special issues would determine whether or not Montoya received the death penalty. Because the trial court accurately conveyed to the jury its role under Texas law in determining whether Montoya should receive the death penalty, and because the "total trial scene" leaves no doubt that the jury was not misinformed of its role, we hold that the district court properly rejected Montoya's *Caldwell* claim.

E

The remainder of Montoya's claims warrant little discussion. Montoya argues that the trial court violated his fifth, eighth, and fourteenth Amendment rights by introducing evidence of unadjudicated criminal conduct at the penalty phase of his trial. Montoya raises these issues to preserve them for future appeal to the Supreme Court, and as he concedes, they are foreclosed by circuit precedent.  *See Duff-Smith v. Collins*, 973 F.2d 1175, 1184 (5th Cir. 1992), *cert. denied*, ___ U.S. ___, 113 S. Ct. 1958, 123 L. Ed. 2d 661 (1993); *Landry v. Lynaugh*, 844 F.2d 1117, 1121 (5th Cir.), *cert. denied*, 488 U.S. 900, 109 S. Ct. 248, 102 L. Ed. 2d 236 (1988).

Montoya also argues that he was illegally detained without a prompt determination of probable cause, in violation of *Gerstein v.*

-33-

*Pugh*, 420 U.S. 103, 95 S. Ct. 854, 43 L. Ed. 2d 54 (1975).[32] Not only is Montoya's claim unsupported by the record, but the Supreme Court clearly stated in *Gerstein* that in requiring a prompt determination of probable cause it did not mean to "retreat from the established rule that illegal arrest or detention does not void a subsequent conviction." *Id.* at 119, 95 S. Ct. at 865; *accord Lofton v. Whitley*, 905 F.2d 885, 889 (5th Cir. 1990) ("Even if [the petitioner] were illegally detained, illegal `detention does not void a subsequent conviction.'" (quoting *Gerstein*, 420 U.S. at 119, 95 S. Ct. at 865)). Consequently, Montoya's claim, even if it were supported by the record, would not entitle him to habeas relief.

### III

For the foregoing reasons, we **AFFIRM** in part, **REVERSE** in part, and **REMAND** with instructions to deny relief.

---

The Supreme Court held in *Gerstein* that the State "must provide a fair and reliable determination of probable cause as a condition for any significant pretrial restraint of liberty, and this determination must be made by a judicial officer either before or promptly after arrest." *Id.* at 125, 95 S. Ct. at 868-69 (footnotes omitted).

GARWOOD and JONES, Circuit Judges, specially concurring.

While concurring in Judge Garza's fine opinion in this case, we deem it appropriate to note an additional ground for rejecting petitioner Montoya's allegation that the federal district court erroneously denied him discovery and an evidentiary hearing on his claim that one of the jurors knew Montoya's victim. See Part IIIC of Judge Garza's opinion. Judge Garza holds that Montoya's petition in federal court did not sufficiently allege a prima facie violation of McDonough Power Equipment, Inc. v. Greenwood, 464 U.S. 548, 104 S.Ct. 845 (1984), to necessitate a federal factfinding endeavor.

We would also point out that Montoya alleged even less about this purported constitutional violation in his last-minute habeas petition filed in state court. In that venue, Montoya merely stated "on information and belief" that a juror knew the victim but did not disclose the fact in voir dire, and he sought time to conduct discovery thereon. He did not attach the affidavit of the other juror that he soon after filed in federal court, nor was there any allegation that the juror's acquaintance with Montoya was just discovered or was not discoverable sooner. He did not allege that the juror's familiarity with the victim was such that it would have biased her against Montoya.

Under these circumstances, Montoya did not allege sufficient facts to establish a prima facie McDonough violation in state court, and the state court properly denied relief on the

-35-

ground that he failed to "reasonably show the existence of any fact or facts which would be material to the issue of the legality of his incarceration."

Because Montoya failed to develop in state court the material facts surrounding this issue of juror disqualification, he was not entitled to a federal court evidentiary hearing unless he established cause and prejudice excusing the default. Keeney v. Tamayo-Reyes, ___ U.S. ___, 112 S.Ct. 1715, 1721 (1992). Montoya alleged in his federal petition neither of these preconditions to the granting of a federal evidentiary hearing. Consequently, we agree with the alternate holding of the district court that Keeney did not require it to conduct the initial factfinding proceeding. As the Supreme Court stated in Keeney, . . . "little can be said for holding a habeas petitioner to one standard for failing to bring a claim in state court and excusing the petitioner under another, lower standard for failing to develop the factual basis of that claim in the same forum." ___ U.S. ___, 112 S.Ct. at 1720.